### KANSAS LIFE INSURANCE CO. v. PEARSON.

No. 23456.   April 23, 1935.

Withdrawn, Corrected, Refiled, and Rehearing Denied June 18, 1935.

Application for Leave to File Second Petition for Rehearing Denied July 16, 1935.

McPherren & Maurer, for plaintiff in error.

Ledbetter, Stuart, Bell & Ledbetter, for defendant in error.

PER CURIAM. This was an action on a life insurance policy issued March 9, 1929, on the life of J. Ed. Pearson. Anna L. Pearson, his widow, as the beneficiary therein, recovered a judgment on a verdict of nine men. The defense was suicide, the policy providing that in case of suicide within one year the amount payable should be only the premium collected. The case was tried before the Honorable Wyley Jones, who received the verdict and ordered judgment entered thereon. Upon the death of said trial judge before motion for a new trial was disposed of, the Honorable R. P. Hill succeeded him, and, after reading the complete record, overruled said motion. We shall refer to the parties as originally designated in the trial court.

There is little, if any, dispute in the record as to the material facts. In the briefs, however, there are some sharp conflicts on what we deem material matters. After a careful perusal and recheck of the record, we believe the following to be a fair statement of the material facts as disclosed by the witnesses:

The plaintiff and her husband lived in Crescent, Okla., at the time of his death, which occurred on July 5, 1929. They had been in the restaurant business in Oklahoma City, which venture had not been profitable, and the deceased had at times

become very much discouraged and despondent, remarking that he could not make it and might as well end it all. However, he would become normal and appear to be in good spirits shortly thereafter, and in so far as the record shows had made no attempt to end his life prior to July 5, 1929. Some little time before his death they had gone out of the restaurant business and were living with the plaintiff's mother, and the deceased was trying to get some work at his trade of brick and carpenter contracting. It appears that he habitually hauled his tools, worth about $150 to $200, around in the back end of his Ford coupe and such tools were in the car on July 4, 1929, when there was a family gathering at their home, it being also plaintiff's birthday. The deceased seemed normal, mentally and physically. He had some money, probably $60 or more, in bills, and gave the plaintiff $10 for a birthday present. He was carrying his Howard watch in his shirt pocket on a chain. The party broke up about 8 p. m., and he remained at home that night and nothing occurred out of the ordinary, and he appeared normal.

The next morning, about 7 o'clock, the deceased left Crescent to go to Marshall, a distance of 16 miles north and west of Crescent, to see about a job of work, which trip he had mentioned the previous day. He stopped at a filling station in Crescent for gasoline and seemed in a normal condition. This was the last time he was seen alive by any witness in the case. At about 3 p. m. he was found dead in his automobile about 1½ miles east of Crescent. The body was under the steering wheel, slumped over, head back, legs apart, blood on his head, face, and shoulders and on the cushion from wounds on the right side of his head. The car was headed west and was parked on the south or left-hand side of the road to the east of a cottonwood tree and partly in the shade thereof. He had evidently been dead about three hours, and there is a dispute in the testimony as to whether or not the car would have been in the shade of the tree three hours before the body was discovered. The doors of the car were closed, but the windows were down, that is, open. A 32-caliber Colt's automatic pistol was found in the car, some witnesses testifying that it was on the floor between his feet and others claiming that it was on the cushion between his legs. One hand was on the steering wheel and the other on his leg, the witnesses being about evenly divided as to which hand was on the wheel and which hand was in his lap. On the floor of the car was found one or two exploded shells of the same size and type as the pistol; and there is some reference in the record to another shell picked up in the highway by some one.

There appeared to be two wounds on the right side of his head in the temporal region, one referred to as a scalp or glancing wound and the other a penetrating wound, which when probed revealed the presence of a bullet at the base of the brain on the left-hand side. There were no powder burns on his face or head.

The undertaker testified that there were three wounds, a glancing wound and two penetrating wounds, the latter being close together and separated by a piece of scalp or flesh, the total size of the hole being larger than a penny; that he probed the wounds and there was one hole entering the head, but after inserting the probe, he could probe two ways, and both holes led into the brain; that it looked to him as if more than one bullet entered the head. However, he seems to have located but one bullet and it was not removed. Medical testimony was to the effect that there was only a scalp wound and one penetrating wound, a probe locating the bullet; but that the opening on the temple was large; that the penetrating wound would cause instant death and that the glancing wound might have rendered the deceased unconscious or stunned him, and if he were so stunned he would not be able to fire a second shot. There was testimony also that at close range a bullet would make a hole almost its exact size, and if a pistol were discharged reasonably close it would leave powder burns. There was evidence also explaining the operation of an automatic pistol and how it ejects each empty shell to the right a distance of one or two feet when fired. There was a bullet hole through the top of the car in front of the left rear corner, the point of entrance being on the inside just above deceased's head. One witness testified the hole was larger than a 32-caliber bullet. There was no testimony whatever as to the ownership of the pistol or that the deceased owned or ever carried one with him, or as to the pistol's condition when found as to having been recently fired or as to the number or kind (metal patched or soft nose) of cartridges, if any, in the

magazine, or the position of the safety lever thereon or whether the deceased was right-handed or left-handed.

An examination of the ground surrounding the car disclosed some fresh tracks leading across the road to the north into the dry grass. There were tracks also some ten or fifteen steps from the car to the south. There were also some tracks south and east of the car leading back northwest toward the car.

When the body was searched there was no watch and no money excepting a few cents found. Neither were the tools in the car. A checkbook was in a rear pocket of the trousers. On the back of one blank check was written the following:

"I am going but God only knows You will get some insurance you should get it all if you get a good lawyer I am just tired of living my stomach is so bad Get the cheapest coffin you can get I am absolutely broke You are the best woman in the world Get Mr. Keck to help you. Ed"

—and on the printed side of the same check was the following:

"Keep every dollar you have, Oh may the Lord bless you, I have done wrong but only one way, that is to gamble in oil and drink, forgive me honey.

"Ed"

On the back of another check appeared the following:

"Honey

"Notify Parot Motor Co to get car but dont pay any more on it.

"Ed

"Get Mr. Keck help you on insurance and dont pay any of my accts for you will have only a few dols left

"Love Ed"

—and on a third check was the following:

"Grairson & Fink of the Edmond National Bank beat me out of $1800.00 Eighteen Hundred on deposit I swear this to be a fact

"J. E. Pearson."

Another note was later found by the plaintiff in his work clothes. It read as follows:

"Honey I have been trying to save myself but only you bless you. There will be some insurance get the cheapest coffin you can get My dues have lapsed in the Oddfellows but I think they will bury me"

According to her testimony he had not worn these work clothes for about three weeks. All of these notes were in pencil, undated and in the handwriting of the deceased. The record is silent as to his having a lead pencil on his person.

The defendant tendered the amount of the premium paid, which tender was refused. A directed verdict for the defendant was refused. The verdict and judgment was for $5,000, the full amount of the policy, and the defendant appeals.

Considering first the instructions, the defendant complains particularly of three of them, Nos. 4, 5, and 6, viz.:

"You are instructed that the love of life is presumed, and that no man will intentionally take his own life, and that the burden is upon him who asserts it to prove the same by a preponderance of the evidence.

"You are instructed that the presumption is that the insured J. Ed Pearson did not intentionally take his own life, but this presumption is a disputable one, and may be overcome by evidence, but the burden of proof rests upon the defendant to overcome the same by a preponderance of the evidence as heretofore defined to you in these instructions.

"You are instructed that the love of life is presumed and that no man will intentionally take his own life; but this presumption is a disputable one and may be overcome by evidence and the defense in this case being suicide, or self-destruction, the burden of proof rests upon the defendant to overcome such presumption by a preponderance of the evidence as heretofore defined to you in these instructions."

It is urged that error was committed in thrice repeating therein the presumption that the decedent did not take his own life. No other objection is made to said instructions. No authorities are cited and the point is not argued in the brief, and, therefore, under the rules of this court, may be treated as waived. It is possible that some undue prominence was given to this presumption and the rule as to the burden of proof, but after a full consideration of the entire record, we cannot say that this repetition was prejudicial or deprived the defendant of any substantial rights.

The serious question in the case and the one to which counsel on both sides have addressed their chief efforts is whether the verdict is sustained by the evidence. We confess that this has given us no little concern and is one to which we have devoted much study. But a painstaking examina-

tion of the record and numerous decisions compelled us to change our first impression and take an entirely different view of the situation and finally to reconcile the verdict with the evidence.

It must be remembered that:

"This court has gone as far as the courts of last resort of any of the states in recognition of the rule that a verdict found upon conflicting testimony will not be disturbed where there is any testimony reasonably tending to support such verdict, and in recognition of the rule that the province of weighing testimony and adjudging the credibility of the witnesses belongs exclusively to the jury." Tate v. Coalgate State Bank, 72 Okla. 276, 180 P. 687.

True, in the same case it is said that:

"Yet in so doing it has not signified that it will decline to reverse a judgment that is not supported by any evidence."

But it will never invade the province of the jury and try facts.

Or, as we said just recently:

"In law actions this court is not concerned with the correctness of the determination of facts based upon conflicting evidence." Connelly v. Loub, 169 Okla. 627, 38 P. (2d) 555.

Since there is nothing in the record to the contrary, it must be assumed that the concurring jurors were honest in their convictions and did their duty as they saw it. It is apparent, therefore, that for the purposes of this appeal it is not a matter of quantity or preponderance of evidence, or the reasonableness or unreasonableness thereof, or what we may personally think of it or of the verdict or the motives of the nine men concurring therein, but the sole question before us is: Was there any evidence, which means, of course, competent evidence, that those nine men could reasonably have believed and relied upon in finding that decedent did not meet death at his own hand? And, as has been said by this court, if the minds of reasonable men might differ as to the cause of death, it is for the jury. Metropolitan Life Insurance Co. v. Plunkett, 129 Okla. 292, 264 P. 827; Penn Mutual Life Insurance Co. v. Spaulding, 50 Okla. 307, 150 P. 494.

In this last case is set out the familiar proposition of law applicable to this kind of case, to wit:

"Upon an issue of suicide, self-destruction is never presumed."

"In an action upon a life insurance policy, where the defense is the suicide of the insured, the burden of establishing self-destruction by a preponderance of the evidence is upon the insurer."

We quote the following from the opinion:

"To disturb the verdict we must hold that the decision reached by the jury is against the uncontradicted evidence and every legitimate inference deducible therefrom, that the insured did in fact intentionally take his own life, and that upon this point the evidence is so conclusive that the minds of reasonable men may not differ."

The facts in that case (without setting them out in detail) would indicate a suicide and homicide by shooting. A bloody pistol dropped from under the body of the insured when moved. Three shots had been fired from it. One was found in the insured's head, the others in the body of his wife. The bullet from his head and one from her body varied six grains in weight. All the wounds on both were powder burned, and there were no tracks. It was the deceased's pistol and it had been recently fired. No motive was shown. This court refused to interfere, citing over 30 cases in support of its position.

In the instant case, to begin with, we cannot assume that the automatic pistol belonged to the insured in the absence of any evidence on the subject. If it belonged to some one else, that would have been very material to the inquiry, and the burden being upon the insurance company, the inference might have been properly drawn by the jury that it was not his pistol. If the testimony of the undertaker was true (and it must be so regarded by this court), the deceased had been shot three times, twice through the brain, either of which wounds under the testimony would have caused instant death and rendered him incapable of firing another shot. Therefore, some one else must necessarily have fired the other shot.

The evidence as to tracks (however unsatisfactory and conflicting it might be) tended to show that one or two other persons had been in close proximity to the automobile, one at least very shortly before the body was found; and it could not have been the passerby in a car who the evidence disclosed discovered the body, because they were traced across the road into the grass. The wounds were not powder burned and the testimony and probably the common experience of those nine jurors was that at close range a pistol will powder burn. The glancing wound and hole (larger than a 32-caliber bullet) in the top of the

car may be consistent with either theory, but it was for the jury to adopt one or the other. There was no evidence that the gun had been fired; was empty or loaded, but it was a 32-caliber pistol, and the testimony was to the effect that the wounds were larger. The absence of the deceased's money, watch and tools was also doubtless considered, and can we say there could have been no legitimate inference drawn therefrom that the insured had been robbed and murdered, even in the absence of direct and positive proof that he had all of such property with him that morning, a matter which was not mentioned at the trial?

These facts and others doubtless persuaded the jury to find and believe that the wounds were not self-inflicted. In any event, the burden was upon the defendant to show that they were, and this it could not do or attempt to do except by other circumstantial evidence, of which the jurors were the judges.

And in that category were the suicide notes admittedly in the insured's own handwriting; but, unfortunately for the defendant, one was found in the deceased's clothes which he had not worn for three weeks. This testimony, if true, and we must assume that it was, conclusively shows that the decedent had been contemplating suicide for at least almost a month, but had never attempted it. The force and effect of the other three notes were doubtless weakened by this testimony, and they could have been and were doubtless construed and interpreted by the jury as simply further evidence of his morbid propensities without any present deadly intentions at the time of their composition. At least, it was a matter for the jury to pass on, and the weight to be given such notes was left properly to their judgment.

As to a motive, proof thereof, while proper, is not indispensable. As was said in Penn Mutual Insurance Co. v. Spaulding, supra, while it is sometimes true that the motive remains undiscovered and its absence affords no reason for ignoring the established facts surrounding the death, yet these facts are for the jury to consider in determining how it occurred and whose act caused it.

The defendant in its brief devotes considerable space to the law of presumption and the effect of evidence rebutting the same, and correctly states the law to the effect that when the presumption (in this case against suicide) is repelled and contradicted by proof, such inference or presumption ceases to exist as a probative element in the case. However, in the instant case, rebuttal testimony was introduced, and it then became a question for the jury on all the evidence, although the presumption was removed from the case, leaving the basic facts for the consideration of the jury.

In St. John v. Ivers, 124 Okla. 215, 255 P. 706, cited by defendant on this proposition, it will be noted that no rebuttal evidence was offered by plaintiff, and, therefore, it was the duty of the trial court to direct a verdict for St. John, "because any other verdict would necessarily rest upon an inference or presumption which no longer existed in the case, would be contrary to the clear weight of undisputed evidence, and, therefore, contrary to law." In our judgment the plaintiff's evidence in rebuttal was sufficient to raise a live issue of fact and demand the submission of the case to the jury.

We have carefully examined the authorities cited by the defendant company in its brief, but we cannot see where they are applicable to the facts in the instant case. In New York Life Insurance Co. v. King (Ga.) 112 S. E. 383, which is extensively quoted, the legal presumption against suicide is discussed at length, and the point is stressed that such presumption is easily rebuttable by physical facts, and the presumption prevails only when the cause of death is unknown and the plaintiff will not be entitled to recover and bolster up the case on such presumption where the facts of the tragedy are introduced in evidence. The death in that case was claimed by the plaintiff to be accidental, but a reading of that case discloses that there was practically an eye-witness to the suicide. The shot was heard and the insured was seen to fall. His pistol, within two feet, was smoking. He was shot through the temple, which was powder burned. No one else but the witness, his son, was near him. He had, or thought he had, an incurable malady which prevented a contemplated marriage, which fact caused him great mortification and humiliation. The evidence was undisputed. There was no question of fact from which any reasonable inference or deduction could be drawn other than that the wound was intentionally inflicted. The judgment for plaintiff was reversed on the theory there was nothing but mere conjecture in favor of accidental death, and this conjecture must yield to facts. As before indicated, we cannot bring ourselves

around to the point of saying that in the case at bar there was no evidence from which the jury might have logically and reasonably inferred that a felonious homicide had been committed.

In Hardinger v. Modern Brotherhood of America (Neb.) 101 N. W. 983, and 103 N. W. 74, cited by defendant, the Supreme Court affirmed the judgment of the trial court, which directed a verdict for the defendant. A comparison is made of that case and the instant case with the statement that here the evidence is more conclusive that the insured took his own life. However, a reading of that case convinces us that it does not bear out counsel's contention. There were no foot-prints or traces of any other human being near or in the immediate vicinity of the body of the insured; his watch, purse, and other effects were found on his person; the wound was blackened around the edges; the smell of pistol smoke still lingered when the witnesses who heard the shot arrived at the scene. And the court referred to Modern Woodman v. Kozak (Neb.) 88 N. W. 248, and the fact that the bullet taken from Kozak's head was unquestionably smaller than the caliber of the revolver found near the body and could not have been fired from that weapon, and said:

"If such proof had been made in the case at bar or if there was any competent evidence to dispute the testimony offered by the defendant in proof of its defense of suicide, an entirely different question would have been presented. In such a case the court should submit the question of fact to the jury, while in the case at bar there was no dispute as to the facts and the whole matter was properly treated as a question of law."

And, quoting from the Kozak Case just cited, the court, commenting on this evidence relative to the disparity in sizes of the bullet and revolver, said:

"This evidence alone would seem to be sufficient to take the case out of the rule that where, from the evidence, reasonable men can draw but one conclusion. the case resolves itself into one of law for the court."

In Deweese v. Sovereign Camp, W. O. W. (Kan.) 204 P. 523, a hanging case cited by defendant. the insured, a man weighing 165 pounds, was found hanging to a rafter in a house he was building; the body was still warm; no one else had been around the premises; there were no marks of violence except where the noose was around his neck, which was broken; in his pocket was a farewell note to his wife. The court discounted the theory of murder under the circumstances, and held that his death could not have been caused by any one but deceased. It will be observed that there were no other facts or circumstances from which any other inference or even conjecture could have been drawn.

Counsel cite also Richey v. Woodmen of the World (Mo.) 146 S. W. 461, where the death was caused by drinking acid. There was a note left by deceased. The plaintiff's evidence disclosed that the deceased was taking medicine, and an attempt was made to show that he might have gotten the wrong bottle by mistake. There was no suggestion of a felonious homicide at the hands of some other person. The court held that the evidence showed that the insured committed suicide and reversed the case, but assigned as a reason the fact that the testimony of the defendant was supported by the plaintiff's witnesses and such uncontradicted facts common to the evidence of both parties should be regarded as proved; that where all the evidence is of such character that it affords no room for reasonable controversy about an ultimate fact, there can be no issue and therefore nothing concerning such fact for the triers of fact to determine. Quoting:

"In each of the cases cited by plaintiff, there was room in the evidence for a reasonable inference against the fact of suicide, and the issue properly was submitted to the jury."

It would serve no useful purpose to discuss other cases cited by counsel for defendant. Many of them are poison cases, and of course it is obvious that in that class of cases there is not such opportunity for inferences and presumptions of death at the hands of an assassin. Each case must stand on its own bottom and it is impossible to find one exactly like the case at bar. Suffice it to say that in our judgment the facts in all of the cases so cited exclude any legitimate, reasonable presumption or inference except intentional self-destruction. As was stated in one of them (Skala v. New York Life Insurance Co. (N. M.) 172 P. 1046, not herein discussed:

"Every fact of importance discloses that the insured committed suicide."

An examination of that case discloses the "physical facts" from which no other conclusion could have been reached. It was another case of "no evidence," while here, in our judgment, the "any evidence" rule must be invoked and applied. The rule

which motivates us to our conclusion is stated in the syllabus of Western States Oil & Land Co. v. Helms et al., 143 Okla. 206, 288 P. 964, as follows:

"On a challenge to the sufficiency of the evidence to support the verdict, the question presented on appeal is, admitting the truth of all the evidence of the plaintiff, together with such inferences and conclusions as may reasonably be drawn therefrom, eliminating all evidence of defendant in conflict with plaintiff's evidence, and all opposing inferences, whether there is any competent evidence tending to support the verdict against defendant."

And, in conclusion, we remark that the trial judge and his successor also approved this verdict, the former as the "thirteenth juror," and this fact under the rule announced by this court is entitled to, and has received due consideration in passing on the merits of this appeal.

The judgment is affirmed.

The Supreme Court acknowledges the aid of Attorneys J. Robert Ray, Glenn H. Chappell, and B. H. Lewis in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Ray and approved by Mr. Chappell and Mr. Lewis, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration, this opinion was adopted.

McNEILL, C. J., and BUSBY, PHELPS, CORN. and GIBSON, JJ., concur. OSBORN. V. C. J., and RILEY and WELCH, JJ., dissent. BAYLESS, J., absent.